UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JANE DOE 1, Individually and on Behalf of All Others Similarly Situated,

       Plaintiff,

   -v-

JPMORGAN CHASE BANK, N.A.,

       Defendant/Third-Party Plaintiff,

   -v-

JAMES EDWARD STALEY,

       Third-Party Defendant.

22-cv-10019 (JSR)

OPINION AND ORDER

---

JED S. RAKOFF, U.S.D.J.:

Plaintiff Jane Doe 1 claims that defendant JPMorgan Chase Bank, N.A. ("JP Morgan") is legally liable for its alleged facilitation of Jeffrey Epstein's sex crimes. On April 28, 2023, Jane Doe moved pursuant to Rule 23(b)(1) and 23(b)(3) to certify the following class:

All women who were sexually abused or trafficked by Jeffrey Epstein during the time when JP Morgan maintained [accounts] for Epstein and/or Epstein-related entities, which included January 1, 1998, through on or about August 19, 2013, both dates inclusive, and continuing to the time of Epstein's death on August 10, 2019. Pl's Mem. of

1

Law in Supp. of Mot. for Class Certification ("Doe
Supp."), ECF No. 122, at 1.

After full consideration of the parties' written submissions and
oral arguments, the Court hereby grants plaintiff's motion and
certifies the proposed class under Rule 23(b)(3).[1]

## I.  Plaintiff's Allegations

Familiarity with plaintiff's allegations is assumed.[2] In
brief, Jane Doe alleges that Jeffrey Epstein sexually abused and
trafficked her, and that JP Morgan's support was essential to
Epstein's sex-trafficking operation. Without access to large
quantities of cash, without JP Morgan's assistance in
"structuring" cash withdrawals, and without JP Morgan's silence,
Jane Doe alleges, Epstein could not have trafficked her and dozens
or even hundreds of other women and girls. She further alleges
that JP Morgan either actually knew or should have known that it
was servicing a sexual predator, and that JP Morgan is therefore
liable to her under the federal Trafficking Victims Protection Act
and under the New York law of negligence. Jane Doe asserts her
claims against JP Morgan both individually and on behalf of a

---

[1] On May 12, 2023, JP Morgan moved to exclude the expert report and reply
expert reply of Jane Khodarkovsky submitted by Jane Doe in support of her motion
for class certification. See ECF No. 130. In deciding this motion for class
certification the Court did not rely on Ms. Khodarkovsky's reports. Thus, JP
Morgan's motion to exclude those reports is hereby denied as moot.
[2] These allegations are described in detail in this Court's May 1, 2023
Opinion and Order granting in part and denying in part JP Morgan's motion to
dismiss the operative complaint. See ECF No. 102.

putative class of other people whom Epstein sexually abused and trafficked.

## II.  Standards for Class Certification

Jane Doe now moves to certify that class. A class may be certified if it satisfies each of the requirements of Rule 23(a) and satisfies at least one of the provisions of Rule 23(b). The moving party bears the burden of proving these requirements by a preponderance of the evidence. Teamsters Local 445 Freight Division Pension Fund v. Bombardier, Inc., 546 F.3d 196, 201–03 (2d Cir. 2008). Rule 23 "does not set forth a mere pleading standard." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011). Instead, a party seeking class certification "must affirmatively demonstrate his compliance with the Rule." Id.

## III. Rule 23(a)

Rule 23(a) imposes four requirements that every class must satisfy: numerosity, commonality, typicality, and adequacy. In addition to these explicit requirements, the Second Circuit also recognizes an implied requirement of ascertainability.

### A. Numerosity

Under Rule 23(a), the class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a). In the Second Circuit, numerosity is presumed when the class contains 40

or more members. Consol. Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995).

The proposed class satisfies this requirement. By JP Morgan's own analysis, 137 people applied for compensation from the Epstein Victims Compensation Program ("EVCP") for injuries that they suffered during the class period. See Decl. of Felicia H. Ellsworth in Supp. of Def's Oppo. to Pl's Mot. for Class Certification ("Ellsworth Decl."), ECF No. 138-26, Ex. 35, Tab N; Def's Mem. of Law in Oppo. to Pl's Mot. for Class Certification ("JP Morgan Opp."), ECF No. 137, at 5. While this statistic is not a precise measure of the proposed class's size, it provides a reasonable indicator that the class well exceeds forty members.[3]

Other evidence supports the finding of numerosity. In 2019, when a grand jury indicted Epstein for sex-trafficking (and conspiring to do the same), it found that Epstein "sexually exploited and abused dozens of minor girls" from "in or about 2002, up to and including at least in or about 2005." See Ellsworth Decl., ECF No. 136-6, at ¶¶ 1, 6, 12-13. While the grand jury's finding is not binding on this Court, it nonetheless suggests that Epstein had so many victims as to make joinder impracticable. And

---

[3] The number of applicants to the EVCP might overstate the numerosity of the proposed class because some applicants might not have been sexually abused or trafficked by Epstein. On the other hand, it might understate the class's numerosity because participation in the EVCP was voluntary. See Pl's Reply Mem. of Law in Further Supp. of Mot. for Class Certification ("Doe Reply"), ECF No. 143, at 2.

the grand jury's finding likely understates the size of the proposed class considerably, since the finding was restricted to a period of approximately only four years out of the twenty-one years in the class period and since the finding concerned only minors, not adults like Jane Doe herself.

JP Morgan argues that many of Epstein's victims should be excluded from the class because they do not possess viable claims. First, JP Morgan argues that Epstein abused many of his victims before JP Morgan either knew or should have known that Epstein was involved in sex-trafficking. In the operative complaint in this case, Jane Doe alleges that JP Morgan actually or constructively knew that fact by no later than 2006, when police reports and news articles revealed that Epstein had sexually abused dozens of young women and girls. First Amended Compl., ECF No. 36, at ¶ 190. If, however, the class is restricted to people who were sexually abused or trafficked by Epstein in or after 2007, JP Morgan calculates that the class would contain only 32 people. See Def's Oppo., ECF No. 137, at 14.

Several pieces of evidence, however, suggest that JP Morgan either knew or should have known that Epstein conducted a sex-trafficking venture long before 2006. JP Morgan filed multiple suspicious activity reports related to Epstein's accounts in 2002. See Ellsworth Decl., ECF No. 138-6, 138-8. Additionally, Epstein withdrew in similarly suspicious fashion over $175,000 from a JP

Morgan account in 2003 and nearly $1 million from that account in 2004 and 2005. See Ellsworth Decl, ECF No. 138-14. The bank's own suspicions regarding these activities and reports suggest that JP Morgan either knew or should have known that Jeffrey Epstein operated a sex-trafficking venture perhaps as early as 2002. And if the class period extends to 2002, information from the EVCP suggests that the proposed class contains well over 100 people. See Ellsworth Decl., ECF No. 138-26, Ex. 35, Tab. N.

Of course, in deciding this motion on the assumption that the class period extends to at least as early as 2002, the Court does not take a position on the ultimate merits of the claims asserted by Jane Doe or other members of the proposed class. Specifically, it does not hereby decide that JP Morgan either knew or should have known that Jeffrey Epstein conducted a sex-trafficking venture by 2002. Rather, since JP Morgan has put at issue whether certain members of the proposed class have viable claims against it, the Court has needed to consider (but not decide) various issues bearing on the viability of their claims. See Wal-Mart, 564 U.S. at 351 (holding that deciding whether to certify a class frequently "will entail some overlap with the merits of the plaintiff's underlying claim"). The evidence introduced for this motion has simply satisfied the Court that class members who were sexually abused or trafficked by Jeffrey Epstein before 2007 but during or after 2002 cannot be excluded at this juncture.

JP Morgan also argues that membership in the proposed class should be further reduced by settlement agreements executed between Epstein's victims and the EVCP. The EVCP's form agreement provided for a "broad release" of claims against "any entities or individuals" who "provided any services to Mr. Epstein." Ellsworth Decl., ECF No. 138-5, at 3. JP Morgan asserts that, since it provided services to Epstein, it is a third-party beneficiary of each agreement that contains this language and, therefore, that every person who signed such an agreement does not have a viable claim against it.

On the evidence now before the Court, however, the EVCP's form agreement does not bar claims against JP Morgan. As the Court noted when it discussed a similar issue raised by defendants in a motion to dismiss in a related case, under here applicable New York law a contract is held to benefit a third-party only if "the language of the contract . . . clearly evidences an intent to permit enforcement by the third party." Fourth Ocean Putnam Corp. v. Interstate Wrecking Co., 485 N.E.2d 208, 212 (N.Y. 1985).

The text of the form agreement does not clearly manifest such an intention. To begin with, the pertinent language is ambiguous, since it does not specify the range or nature of services provided to Epstein that qualify a third-party (such as JP Morgan) for benefits under the release. As the Court noted at oral argument on defendants' motion to dismiss, the class of people who "provided

7

services to Mr. Epstein" is, on certain interpretations of that phrase, exceedingly broad. See Oral Argument of Mar. 20, 2023, ECF No. 67, Tr. 7:15-19. If that phrase covers literally any person who provided services to Jeffrey Epstein, it would cover every person who gave Epstein a piano lesson, drove him in a taxi, changed his tires, or trimmed his hair. Id. It is by no means clear that the Estate of Jeffrey Epstein intended to secure protections for these hundreds or thousands of people when it negotiated and later signed settlement agreements through the EVCP.

The Court's skepticism is reinforced by a settlement agreement submitted in a related case, Jane Doe 1 v. Deutsche Bank Aktiengesellschaft et al., 22-cv-10018.[4] In that related case, defendants submitted a settlement agreement executed between the plaintiff in that case (hereinafter referred to as "DB Jane Doe") and the Epstein Estate. That agreement (hereinafter, the "DB Settlement Agreement") was styled a "broad release" of claims against "any entities or individuals who are or have ever been engaged by (whether as independent contractors or otherwise), employed by, or worked in any capacity for" Jeffrey Epstein. See Decl. of David B. Hennes in Supp. of Mot. to Dismiss, Ex. A, at p. 2. But the parties to that agreement further stated that they "do not believe there is any reasonable interpretation that this

---

[4] JP Morgan draws a comparison to this settlement agreement in its opposition to class certification. See Def's Oppo., ECF No. 147, at 8, 20.

General Release could be construed to release James ("Jes") Staley, Leon Black, <u>or their respective entity affiliations</u>" (emphasis supplied). <u>Id</u>. at p. 4. Since Jes Staley was employed by JP Morgan, this language demonstrates that the Epstein Estate did not intend to release claims against financial institutions that provided services to Epstein through its "broad release." <u>See</u> Opinion and Order, May 1, 2023, at 15.

True, as JP Morgan points out, the EVCP's form release does not include any similar carve-out for Jes Staley, Leon Black, or the financial institutions with which they are affiliated. But that is beside the point. The "broad release" in the DB Settlement Agreement is nearly identical to that of the EVCP's form agreement. If the former "could not reasonably be read" so as to extend to JP Morgan, agreements that track the latter cannot be read in that way as well.[5]

Thus, neither of JP Morgan's arguments undermines the numerosity of the proposed class. Even if the proposed class is restricted to people who were sexually abused or trafficked by Jeffrey Epstein after JP Morgan, allegedly, either knew or should have known of Epstein's sex-trafficking venture, the class likely contains well over 40 people. Additionally, putative members of

---

[5] Once again, of course, this conclusion for certification purposes does not preclude JP Morgan from introducing further evidence in support of its interpretation of the contract at a later stage of this case, such as summary judgment or trial.

the class should not be excluded at this stage because they signed the ambiguous EVCP form agreement. Accordingly, the Court finds that the proposed class satisfies Rule 23(a)'s requirement of numerosity.

## B. Commonality

Rule 23(a) also requires that some questions of law or fact must be common to the class. A question is common to the class if it is "capable of classwide resolution -- which means the determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Lopez v. Setauket Car Wash & Detail Ctr., 314 F.R.D. 26, 28 (E.D.N.Y. 2016). "Even a single common question of law or fact may suffice to satisfy the commonality requirement." Pub. Employees' Ret. Sys. of Mississippi v. Merrill Lynch & Co., 277 F.R.D. 97, 105 (S.D.N.Y. 2011); see also Marisol A. v. Giuliani, 126 F.3d 372, 376 (2d Cir. 1997) ("The commonality requirement is met if plaintiffs' grievances share a common question of law or of fact.") (emphasis supplied).

This case raises not just one but many questions that are capable of classwide resolution. With respect to Jane Doe's TVPA claims, these questions include, among others:

- Whether Jeffrey Epstein ran a sex-trafficking venture;

10

- Whether JP Morgan knew (or recklessly disregarded) that such a venture existed;

- Whether JP Morgan participated in that venture;

- Whether JP Morgan participated in that venture;

- Whether JP Morgan obstructed the enforcement of the TVPA with respect to Jeffrey Epstein's sex-trafficking venture.

And with respect to Jane Doe's negligence claims, common questions include, among others:

- Whether JP Morgan owed a duty to Epstein's victims;

- Whether JP Morgan breached its duty to Epstein's victims by providing banking services to Epstein.

In response, JP Morgan identifies several issues, which, it argues, must be resolved on an individualized basis. These issues include: (1) whether JP Morgan's conduct caused harm to each class member, an element of plaintiff's TVPA obstruction and negligence claims; (2) whether each class member was coerced by Epstein into performing commercial sex acts, an element of plaintiff's TVPA participation claim (except as to minors); and (3) various of JP Morgan's affirmative defenses.

But even if these questions must be resolved on an individualized basis (an issue discussed at further length below), the commonality requirement nonetheless is satisfied. As noted earlier, Rule 23(a) merely requires the class members' claims to

share a common question of law or fact, and the claims in this case clearly do.

C. Ascertainability

The Second Circuit recognizes an implied requirement of ascertainability. Under this requirement, "the identity of class members must be reasonably ascertainable by reference to objective criteria." Ebin v. Kangadis Food Inc., 297 F.R.D. 561, 566-67 (S.D.N.Y. 2014). This standard is "not demanding." Id. It is "designed only to prevent the certification of a class whose membership is truly indeterminable." Id.

The proposed class satisfies this requirement as well. While the class is defined by reference to a factual question -- namely, whether Jeffrey Epstein sexually abused or trafficked each member -- that question can be answered by consulting publicly available records, prior legal proceedings, and, plaintiff represents, documentation provided by her. The class is therefore ascertainabable.

D. Typicality

Having discussed Rule 23(a)'s requirements that are incumbent on the class, the Court now turns to those requirements that apply to its proposed representative, Jane Doe. Rule 23(a) also requires that "the claims or defense of the representative parties are

typical of the claims or defenses of the class. Fed. R. Civ. P. 23(a)(3). This requirement is satisfied "when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." Robidoux v. Celani, 987 F.2d 931, 936 (2d Cir. 1993).

Jane Doe argues that she satisfies the typicality requirement because her claims and those of other class members are based in the same "course of events." Paguirigan v. Prompt Nursing Emp. Agency LLC, No. 17-CV-1302 (NG) (JO), 2018 WL 4347799, at *5 (E.D.N.Y. Sept. 12, 2018). Like other class members, Jane Doe alleges that JP Morgan facilitated Epstein's sex-trafficking venture, which in turn harmed her.

JP Morgan responds that Jane Doe is atypical in three ways. First, JP Morgan asserts that Jane Doe was uniquely susceptible to recruitment by Epstein, because she had "substantial emotional and financial vulnerabilities." Ellsworth Decl., ECF No. 138-4, at 8. But it is unclear how this allegation, if true, would render Jane Doe atypical of the class. Many other class members also had substantial vulnerabilities, financial or otherwise. See Ellsworth Decl., ECF No. 138-26, Ex. 35, Master II.D., II.F., II.G. (showing that 18 applicants to the EVCP had experienced food insecurity, 13 had experienced homelessness, 17 had experienced other types of financial insecurity, and many had little income prior to their recruitment by Jeffrey Epstein). And even if Jane

Doe were uniquely vulnerable, that would only serve to <u>support</u> her claims, not undermine them. <u>Darquea v. Jarden Corp.</u>, 06 Civ. 722 (CLB) (Consolidated), at *5 (S.D.N.Y. Mar. 6, 2008) ("The unique defense rule is "intended to protect [the] plaintiff class — not to shield defendants from a potentially meritorious suit.").

JP Morgan also argues that Jane Doe is subject to two affirmative defenses that might not apply to other class members. <u>See</u> <u>Royal Park Invs. SA/NV v. U.S. Bank Nat'l Ass'n</u>, 324 F. Supp. 3d 387, 398 (S.D.N.Y. 2018) ("Although the existence of a meritorious defense does not necessarily defeat certification, affirmative defenses may be considered as a factor in the class certification calculus."); <u>Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 903 F.2d 176, 180 (2d Cir. 1990) ("[C]lass certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation . . . .").

The first such affirmative defense arises from the TVPA's statute of limitations. Under the applicable statute of limitations, a TVPA claim must be brought by an adult sex-trafficking victim "not later than . . . 10 years after the cause of action arose[.]" 18 U.S.C. § 1595(c)(1).[6] Since Jane Doe filed her initial complaint in this case on November 24, 2022, the

---

[6] With respect to minors, the TVPA's statute of limitations begins to run once the victim reaches 18 years of age. 18 U.S.C. § 1595(c)(2).

statute of limitations period that applies to her TVPA claims extends back to November 24, 2012. JP Morgan asserts that the TVPA's statute of limitations bars Jane Doe's TVPA claims, because (JP Morgan claims) Jane Doe does not allege any act or omission by JP Morgan that injured her on or after November 24, 2012. See Def's Answer, ECF No. 83, at 62; Def's Oppo., ECF No. 137, at 12.

But this affirmative defense does not undermine Jane Doe's typicality. As JP Morgan's own arguments concerning numerosity suggest, JP Morgan likely will raise this defense with respect to many, if not most, members of the proposed class, who allegedly suffered at the hands of Jeffrey Epstein before November 24, 2012. This defense, therefore, does not make Jane Doe atypical; it confirms her typicality.

The second affirmative defense that purportedly makes Jane Doe atypical is in pari delicto. In its Answer, JP Morgan asserts that Jane Doe's claims are barred because she, allegedly, helped to recruit other victims of Epstein. Def's Answer, ECF No. 83, at 62. Many other members of the class, JP Morgan claims, did not assist Epstein's recruitment in a similar fashion.

But this defense is unlikely to become the focus of the litigation. Gary Plastic Packaging v. Merrill Lynch, 903 F.2d 176, 180 (2d Cir. 1990) ("[C]lass certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation.") (emphasis

supplied); In re Digital Music Antitrust Litigation, 321 F.R.D. 64, 97 (S.D.N.Y. 2017) (requiring the defendant to show that the unique "is meritorious enough to require the plaintiff to devote considerable time to rebut the unique defense."). As the name of the defense suggests, "the true focus of the in pari delicto doctrine is whether the defendant's wrongdoing is at least equal to that of the plaintiff's." New Greenwich Litig. Tr., LLC v. Citco Fund Servs. (Europe) B.V., 145 A.D.3d 16, 25 (N.Y. App. Div. 2016) (emphasis supplied); see also Kirschner v. KPMG LLP, 15 N.Y.3d 446, 464 n.4 (N.Y. 2010) ("The doctrine's full name is in pari delicto potior est conditio defendentis, meaning "[i]n a case of equal or mutual fault, the position of the [defending party] is the better one."). While Jane Doe has testified, in her deposition, that she introduced at least one other victim to Epstein, Ellsworth Decl., Ex. 25 at 116:6-118:3; id. at 123:18-20, she also alleges that Epstein forced her and other victims into doing so. See, e.g., Decl. of David Boies in Supp. of Pl's Mot. For Class Certification, ECF No. 96-8 at 47, 49, 56, 61; ECF No. 96-3 at 55; ECF No. 96-25 ¶ 2. JP Morgan is, of course, free to argue on summary judgment and at trial that such coerced activity makes Jane Doe equally at fault. Based on the arguments and evidence already introduced in this case, however, the Court anticipates that JP Morgan will focus on other defenses. Those defenses are well-addressed on a class-

wide basis, and the defense of <u>in pari delicto</u> can, if necessary, be segregated from them.

Since Jane Doe's claims arise out of the same course events as those of other class members, and since similar legal arguments bear on her and other class members' claims, the Court finds that the typicality requirement is satisfied.

E. <u>Adequacy</u>

[A]dequacy requires that the representative of the parties will "fairly and adequately protect the interests of the class." <u>In re MF Global Holdings Ltd. Inv. Litig.</u>, 310 F.R.D. 230, 237 (S.D.N.Y. 2015).

The case for Jane Doe's adequacy as a representative is strong. She is incentivized to promote the interests of the class, since her own interest -- like that of other class members -- is to secure a judgment against JP Morgan and to secure as large an award of damages as is possible. And Jane Doe has confirmed her commitment to success in this matter through her active participation up to this point. Among other things, Jane Doe has already been deposed once -- a grueling experience, given the deposition's length and its subject-matter -- and she has agreed to be deposed again. <u>See</u> Doe Supp., ECF No. 99, at 14. Finally, Jane Doe's counsel is "qualified, experienced and generally able

to conduct the litigation." See In re Drexel Burnham Lambert Grp., Inc., 960 F.2d 285, 291 (2d Cir. 1992).

JP Morgan's sole argument against Jane Doe's adequacy is unavailing. JP Morgan claims that Jane Doe will not adequately represent the class because, it alleges, she helped Jeffrey Epstein to recruit other members of the proposed class. Even if that allegation is true -- which Jane Doe largely disputes -- it does not undermine Jane Doe's adequacy. Under Rule 23(a)(4), the key question is whether "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Even if Jane Doe helped Epstein to recruit other members of the class in the past, she shares a common interest with them now in securing a judgment against JP Morgan. And if JP Morgan asserts its in pari delicto defense against Jane Doe at summary judgment or at trial, Jane Doe's interest -- like that of other class members -- lies in defeating it.

Since Jane Doe's interests are aligned with those of class members, she is committed to pursuing this case zealously on behalf of the class, and she has retained qualified counsel, the Court finds that Rule 23(a)'s adequacy requirement is satisfied.

F. Conclusion

In sum, the proposed class satisfies all of the requirements imposed by Rule 23(a). The class is sufficiently numerous; the

case raises dispositive questions of law and fact that are common
with respect to the class; the class members are ascertainable;
and the proposed class representative, Jane Doe, is both typical
of the class and will adequately represent the interests of other
members of the class.

IV.   Rule 23(b)

Plaintiff seeks to certify the class pursuant to Rule
23(b)(3).[7] Under this rule, the proposed class must satisfy two
requirements. First, it must be the case that "questions of law or
fact common to class members predominate over any questions
affecting only individual members." Fed. R. Civ. P. 23(b)(3).
Second, "a class action [must be] superior to other available
methods for fairly and efficiently adjudicating the controversy."
Id. The Court finds that the proposed class satisfies each of these
requirements.

---

[7] In the alternative, plaintiff seeks to certify the class under Rule
23(b)(1)(A) because "individualized litigation could potentially create
"inconsistent or varying adjudications with respect to individual class members"
or "establish incompatible standards of conduct for the party opposing the
class." Fed. R. Civ. P. 23(b)(1)(A). Plaintiff, however, seeks only monetary
damages. Additionally, different judgments resulting from individual actions
would not necessarily be inconsistent in a way recognized by Rule 23(b)(1)(A),
because faithful application of the law could make JP Morgan liable to one class
member but not to another. On both of these grounds, therefore, certification
under Rule 23(b)(1)(A) must be denied.

A. <u>Predominance</u>

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). A common question is one for which "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." <u>Tyson Foods, Inc. v. Bouaphakeo</u>, 577 U.S. 442, 453 (2016). For such questions to predominate, they must be "more prevalent or important than the non-common, aggregation-defeating, individual issues." <u>Id</u>. Thus, "Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." <u>UFCW Local 1776 v. Eli Lilly and Co.</u>, 620 F.3d 121, 131 (2d Cir. 2010). Rule 23(b)(3) does not require a plaintiff to show that <u>no</u> individual issues exist; that would be an impossibly high standard. <u>Pub. Employees' Ret. Sys. of Mississippi v. Merrill Lynch & Co.</u>, 277 F.R.D. 97, 111 (S.D.N.Y. 2011); <u>see</u> <u>also</u> <u>Tyson Foods</u>, 577 U.S. at 453 (Common questions can predominate even when "other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members."). Rather, the core

inquiry is whether the proposed class is "sufficiently cohesive to warrant adjudication by representation." Amchem Prod., Inc. v. Windsor, 521 U.S. 591, 623 (1997).

An analysis of predominance must begin with the elements of the plaintiff's claims. To prove her claim that JP Morgan knowingly benefited from participating in Jeffrey Epstein's sex-trafficking venture, in violation of the TVPA, Jane Doe must show that: (a) Jeffrey Epstein conducted a sex-trafficking venture; (b) JP Morgan participated in that venture; (c) JP Morgan benefited from participating in that venture; and (d) JP Morgan either knew or recklessly disregarded the fact that Jeffrey Epstein's sex-trafficking venture existed. 15 U.S.C. § 1591(a)(2). To prove her claim that JP Morgan obstructed the enforcement of the TVPA with respect to Jeffrey Epstein's sex-trafficking venture, Jane Doe must show that (a) JP Morgan knew of an effort to enforce the TVPA and that (b) JP Morgan intentionally obstructed, interfered with, or prevented the enforcement of the TVPA. See 18 U.S.C. § 1591(d); United States v. Farah, 766 F.3d 599, 612 (6th Cir. 2014). Finally, with respect to Jane Doe's negligence claims, she must show: (a) that JP Morgan owed a duty to her, either as an ordinary person or as a bank providing non-routine services; (b) that JP Morgan breached this duty by providing financial and other support to Jeffrey Epstein; and (c) that harm to Epstein's victims was a natural and foreseeable consequence of JP Morgan's actions. See

Solomon ex rel. Solomon v. City of New York, 489 N.E.2d 1294 (N.Y. 1985).

These claims rest on a core of questions that are common to the class. If each class member pursued an individual action against JP Morgan, she would have to prove that Jeffrey Epstein conducted a sex-trafficking venture; that JP Morgan participated in it by providing material banking services for Epstein (among other things); that JP Morgan benefited from its participation; and that JP Morgan either knew, recklessly disregarded, or (in the case of negligence) should have known that Epstein conducted as sex-trafficking venture. On the TVPA obstruction claim, each class member would also have to prove that JP Morgan knew of a particular attempt to enforce the TVPA with respect to Epstein and that JP Morgan intentionally obstructed that enforcement effort. And on the negligence claims, each class member would have to establish that JP Morgan owed a duty as an ordinary person who might have "set in motion" Epstein's wrongs or as a bank that provided non-routine services to him, as well as proving that JP Morgan's support for Epstein's sex-trafficking operation was a proximate cause of injury to Epstein's victims. The legal questions on these elements are to be resolved with class-wide arguments; the factual questions are susceptible to generalized proof. The core of this case, therefore, is a single controversy that can be resolved "in

one stroke." <u>Wal-Mart</u>, 564 U.S. at 350. It is, in many respects, the quintessential class action.

On the corners of this common case, JP Morgan purports to identify some questions that must be resolved on an individualized basis. Many of these questions, however, are in fact either wholly or largely common to the class. And the individual inquiries that remain are peripheral.

The first issue that, according to JP Morgan, requires individual adjudication, is whether Jeffrey Epstein or his associates caused each adult member of the class to engage in a commercial sex act by means of "force, fraud, or coercion."[8] On the facts now before the Court, force and fraud likely would need to be proved on an individualized basis. The evidence before the Court suggests that Epstein did not use a common act of force against the entire class: some victims allege that they were kidnapped, others allege that they were locked up, and one alleges that she was held at knife point. Ellsworth Decl., ECF No. 138, Ex. 35, Tab. L. As for fraud, fraud requires proof of reliance, and reliance presents a notoriously individualized inquiry. <u>See</u>

_____

[8] The TVPA forbids either benefiting from, or obstructing the enforcement of the TVPA with respect to, a sex-trafficking venture. 18 U.S.C. § 1591(a)(2); (d). Sex-trafficking, in turn, is defined as either causing a minor to engage in a commercial sex act, or causing an adult to engage in such an act by means of force, fraud, or coercion. 18 U.S.C. § 1591(a)(2). Thus, it is an element of each adult class member's TVPA claims that they were caused to perform a commercial sex act by means of force, fraud, or coercion

Halliburton Co. v. Erica P. John Fund, Inc., 573 U.S. 258, 268 (2014).

Coercion, however, is more amenable to common proof. The TVPA imposes a hybrid objective-subjective test for coercion, which asks whether "a reasonable person of the same background and circumstances would have also felt coerced," taking into consideration the "particular vulnerabilities of a person in the victim's position." United States v. Rivera, 799 F.3d 180, 186-187 (2d Cir. 2015). Moreover, Jane Doe alleges that Jeffrey Epstein recruited his victims with a common modus operandi. His pattern was to use prior victims to lure young, vulnerable victims, bring the victim to his home, sexually abuse the victim during a massage, and then provide the victim with cash or something else of value. Whether he in fact used this pattern, and whether it would make a reasonable person (characterized by the youth and relative deprivation that was typical of Epstein's victims) feel coerced, are issues capable of common proof.[9]

Second, JP Morgan argues that causation cannot be proved on a classwide basis. To secure a favorable judgment on her negligence claims at trial, Jane Doe must prove that her injury was the

---

[9] It is true that whether Epstein coerced each class member is not entirely capable of common proof, since the particular vulnerabilities of each class member varied to some extent. Based on this fact, JP Morgan might argue, at a later stage of this litigation, that certain members of the class were not actually coerced into performing commercial sex acts. But that argument would form a relatively minor part of this case and could be addressed through post-trial proceedings.

"natural and foreseeable consequence" of JP Morgan's provision of
banking services to Jeffrey Epstein. Hain v. Jamison, 68 N.E. 3d
1233, 1236-37 (N.Y. 2016). JP Morgan argues that this issue cannot
be resolved on a class-wide basis because different members of the
proposed class allegedly were abused by Epstein at different
moments in time, and JP Morgan's provision of services to Epstein
might have furthered Epstein's abuse of some but not others.

As noted above, however, the evidence before the Court
indicates that Epstein had a typical modus operandi, and the nub
of Jane Doe's claim is that JP Morgan sustained Epstein's operation
in a similar way throughout its existence. More specifically, Jane
Doe's theory of causation asserts that: (a) JP Morgan's
participation was a but-for cause of Jeffrey Epstein's sex-
trafficking venture and that (b) the venture harmed each class
member. This theory of causation makes causation a largely common
question.

JP Morgan argues that the TVPA's statute of limitations
introduces a third individualized inquiry. Because the TVPA has a
10-year statute of limitations, JP Morgan argues that each adult
putative class member pursuing a TVPA claim will have to prove
that she was trafficked after November 24, 2012 (ten years before
Jane Doe's complaint was filed).

This issue is easily addressed. JP Morgan assumes that the
TVPA's statue of limitations begins to run, with respect to a

plaintiff, on the last day that that particular plaintiff was injured by a particular sex-trafficking venture. Assuming, without deciding, that this interpretation is correct, the individualized inquiry that it raises could be managed at a later stage of this case by narrowing the class to those people who were either sexually abused or trafficked by Jeffrey Epstein on any date after November 24, 2012 on which JP Morgan maintained an account for Epstein and/or Epstein-related entities.

The fourth purportedly individualized inquiry identified by JP Morgan -- the settlement agreements executed between various class members and the EVCP -- can be handled in a similar fashion. If extrinsic evidence shows that the language in the EVCP's form release bars claims against JP Morgan, then the victims who signed a release containing that language be excluded from the class at a later time. Thus, this issue does not seriously undermine the predominance of common questions.

Fifth, JP Morgan claims that its in pari delicto defense must also be resolved on an individualized basis. It is true that the extent to which each class member helped Epstein to recruit other victims varies. However, for reasons given above, this issue is unlikely to become a focus of this case and can be addressed post-trial if necessary.

Finally, JP Morgan notes that damages will have to be resolved on an individualized basis. But that is commonplace in class

actions certified under Rule 23(b)(3), and "it is well-established that the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification." Pub. Employees' Ret. Sys. of Mississippi, 277 F.R.D. at 119.

Considering all of the above, the Court finds that common questions of law or fact predominate. The core of this case -- plaintiff's allegation that JP Morgan supported Jeffrey Epstein's sex-trafficking venture while it knew or should have known that that venture was in operation -- involves a common set of questions of law and fact. This core set of has already been subject to extensive discovery and forms the chief part of any class member's complaint against JP Morgan. While plaintiff's prima facie case and JP Morgan's anticipated defenses might raise some questions that are specific to each class member, these questions are relatively peripheral and can be handled at a later date.

B. Superiority of the Class Action

Rule 23(b)(3)'s second requirement is that the class action "is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Factors to consider include: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the

desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Id.

The Court has little problem in concluding that this requirement is satisfied here. First, while the intensely personal nature of the claims at stake might give class members an interest in individually controlling their prosecution, it might also -- to an equal or even greater extent -- give them an interest in class-wide adjudication. On behalf of the class, Jane Doe has borne the burdens of turning over highly sensitive documents and communications in discovery, as well as sitting for depositions and other examinations. A class action would also spread the risk and expense of litigating against a tenacious and well-resourced adversary across the class.

Second, proceeding as a class action and concentrating litigation in this single forum would achieve manifest efficiencies. The parties have already taken extensive discovery on Jane Doe's claims against JP Morgan as well as JP Morgan's pendant claims against third-party defendant James ("Jes") Staley. Additionally, several members of the putative class reside in several other countries and might well lack familiarity with the U.S. legal system. See Menocal v. GEO Grp., Inc., 882 F.3d 905, 917 (10th Cir. 2018). Proceeding as a class action would both avoid a "multiplicity and scattering of suits," In re MF Glob. Holdings

28

Ltd. Inv. Litig., 310 F.R.D. 230, 239 (S.D.N.Y. 2015), and it would empower some "people who individually would be without effective strength to bring their opponents into court at all." Amchem, 521 U.S. at 617.

Finally, "there are no apparent difficulties that are likely to be encountered in the management of this action as a class action apart from those inherent in any hard-fought battle where substantial sums are at issue and all active parties are represented by able counsel." Cromer Fin. Ltd. v. Berger, 205 F.R.D. 113, 134 (S.D.N.Y. 2001). To the extent management issues arise, this Court has the ability to "utilize the available case management tools to see that all members of the class are protected, including but not limited to the authority to alter or amend the class certification order pursuant to Rule 23(c)(1)(C), to certify subclasses pursuant to Rule 23(c)(5), and the authority under Rule 23(d) to issue an order ensuring the fair and efficient conduct of the action." In re Flag Telecom Holdings, Ltd. Sec. Litig., 574 F.3d 29, 37 (2d Cir. 2009).

## V.  Conclusion

For the foregoing reasons, the Court finds that the proposed class satisfies Rules 23(a) and Rule 23(b)(3). Accordingly, Jane Doe's motion for class certification is hereby granted. The Court hereby certifies the proposed class, appoints Jane Doe as class

representative, and appoints Boies Schiller Flexner, LLP and Edwards Pottinger, LLC as class counsel. Additionally, the Court hereby denies JP Morgan's motion to exclude the expert reports of Jane Khodarkovsky as moot.

The Clerk is respectfully directed to close entries numbered 95 and 130 on the docket of this case.

    SO ORDERED.

New York, NY
June 12, 2023                    _____
                                 JED S. RAKOFF, U.S.D.J.